Bebtbam Habnett, J.
The tale of woe that followed the erroneous issuance of a building permit in Long Beach forms the subject of this legal visitation. Among other things, it finds a city vainly trying to hide behind the notice provisions of section 50-e of the General Municipal Law when challenged for the administrative miscarriage of its own key officials.
154 East Park Avenue Corp. (“ 154 ”) owns a building in Long Beach, New York that was damaged by fire on January 11, 1972. The building was a mixed residential and commercial three-story structure that was nonconforming in the sense that a city ordinance enacted after the original construction of the building prohibited such “ mixed ” usage.
Seeking to restore the damaged portions, the corporation applied for a building permit and obtained one on July 5, 1972, issued by the Building Commissioner of the City of Long Beach, Arthur Zimmerman.
Then, in September, 1972, after reconstruction was started, the city revoked the permit claiming it had mistakenly granted it in the first place. The error claimed was that over 50% of the structure had been damaged by fire and a Long Beach ordinance allowed rebuilding of nonconforming structures only where not more than one half of its value or cubical contents was damaged.
154 sued the city and the Building Commissioner, seeking an injunction directing the city to reissue the original permit. Failing that, it seeks damages for expenditures made in reliance on the issued then withdrawn permit.
A full nonjury trial was held, and at the completion of all proof, the court dismissed the action personally against Commissioner Zimmerman on the grounds that (1) in issuing the permit he was acting in his discretion within the scope of his employment; and (2) absent any demonstrated fraud or bad faith, he then could not be held liable in damages. This leaves the case against the city.
A. ATTEMPT TO HAVE EBBONEOUS PEBMIT BEISSUED
First, we consider whether injunctive relief is appropriate here to direct reissuance of the permit.
*447 1. THE GOVERNING ORDINANCES
154’s building stood before the adoption of, but failed to conform to, section 9-106.6 of the Municipal Code of the City of Long Beach which provides, in pertinent part: “ Anything contained in this code to the contrary notwithstanding, no building or premises shall be used and no building or structure shall hereafter be altered or hereafter erected which is intended or designed to be used for both residential and business or commercial purposes ’ ’.
In defining the conditions for rebuilding damaged nonconforming buildings, section 9-108 of the Municipal Code provides, in pertinent part: “ Any non-conforming building damaged by fire or act of God to an extent not exceeding one-half its value or one-half its cubical contents, may be repaired within six (6) months subject to the provisions of the Building Code, and used as before
Since section 9-108 is permissive, applications for variance or special exception may be available, but no such special applications have been demonstrated here. The court must proceed then strictly on ordinance applicability.
2. FIRE DAMAGE EXCEEDED THE REQUISITE ONE-HALF QUANTUM
The testimony of experts, in particular, the engineer retained by the city to inspect and analyze the percentage damage to this building, and the pictures submitted, persuade the court that over 50% of the building’s value and cubical contents had been destroyed. Burning, charring, and scorching were evident in many places. The third floor was apparently almost totally destroyed, the second floor and staircase severely damaged, and fire and smoke impact were evident even on the first level. And, the water damage was also extensive. The repair costs of plumbing, electrical work and carpentry would have far exceeded one half of the value of the building. And, the inside volume damage exceeded one half of the whole.
Moreover, at the request of the parties, and in their presence, the court conducted an on-site view of the premises in question.
The court has no doubt as to the scope of the destruction, unquestionably in terms of value, and convincingly in terms of cubical contents.
3. THE ORDINANCES ARE NOT UNCONSTITUTIONAL
Both city ordinances are valid exercises of municipal authority to regulate building construction and usage (see Concordia Collegiate Ins. v. Miller, 301 N. Y. 189).
*448 a. EFFECT OF MAJOR DESTRUCTION ON NONCONFORMING USE
Section 9-108 is intended to strike an equitable balance in allowing rebuilding of a nonconforming structure with only relatively minor damage done to it. The continued allowance of a use, valid when a building was raised but violation of later legal proscriptions, is rooted in equitable consideration and fairness. It would not be fair, indeed would deprive a person of property without due process, to prosecute or require substantial building alteration under a law not in force at the time of initial construction (see Matter of Bexson v. Board of Zoning & Appeals of Town of Hempstead, 28 A D 2d 848, affd. 21 N Y 2d 961). But, where much of the structure is destroyed by accident, the owner becomes more like a new builder, starting from scratch. At some point of damage, it becomes reasonable to mandate compliance with all existing building codes even though some of the surviving frame and beams, in fact, predated in construction the now enforced requirements. The loss of a right to continue a nonconforming use is reasonably related to the lessened existence of the original structure investment, after the fire.
We cannot say that the 50% cutoff point is unreasonable or confiscatory in either value or cubical content (see Matter of Off Shore Rest. Corp. v. Linden, 30 N Y 2d 160; Matter of Bobandal Realties v. Worthington, 21 A D 2d 784). In essence, the fortuitous fire, not the later municipal enactment, is primarily responsible for loss of the continued use.
There is no absolute vested right to totally rebuild a nonconforming structure. Entitlement of that sort relates more to preserving the original structure and making minor repairs to it, and when that structure is substantially damaged by fire, the entitlement may likewise disappear in the flames (see Matter of Koeler v. Bedell, 254 App. Div. 584, affd. 280 N. Y. 692).
b. MIXED USB
And, likewise, section 9-106.6 of the Municipal Code, the or (financial prohibition against mixed residential and commercial uses in a single structure, serves to keep apart living and working population, activity and enclosures, and to unify the uses existent in any one building. It is principally designed to prevent commercial intrusion into a residential structure where the particular zoning district allows both kinds of uses generally. In all, the mixed use prohibition cannot be said to ignore the common good or to be unconstitutional (see People v. Calvar Corp., 286 N. Y. 419; Brous v. Town of Hempstead, 272 App. Div. 31, 272 App. Div. 777).
*449 Nor has there been sufficient attempt by 154 to show that the application of these ordinances is confiscatory or deprives it of any reasonable use of, or economic return from, the property (see Matter of Fulling v. Palumbo, 21 N Y 2d 30).
4. NO AUTHORITY TO COMPEL DISREGARD OR WAÍVER OF ORDINANCE
154 still contends that Commissioner Zimmerman’s initial granting act, even if found improper under valid ordinances, nonetheless binds the city to accept and continue the permit.
It is well settled that a municipality is not bound or estopped by the acts of its own employees in erroneously granting a building permit that was not authorized by existing ordinances (Premium Bond Corp. v. City of Long Beach, 249 App. Div. 756; see New York City Employees’ Retirement System v. Eliot, 267 N. Y. 193). "Where a municipal worker improperly applies the city law, and someone relies upon that application, the law does not become a nullity; the employee action does (Altschul v. Ludwig, 216 N. Y. 459; Shepard v. Village of Skaneateles, 300 N. Y. 115).
Accordingly the revocation by the city of the initial building permit was valid, indeed even required as a necessary act to enforce the ordinance previously misapplied.
B. MUNICIPAL MONEY DAMAGE LIABILITY
The court has found, in dismissing this action against Commissioner Zimmerman personally, that his erroneous granting of the building permit was discretionary and was not willful or malicious (Rottkamp v. Young, 21 A D 2d 373, affd. 15 N Y 2d 831; see Municipal Code of City of Long Beach, art. 1, § 7-126).
We do believe, however, that his assessment of the fire damage was improper since the extent of destruction easily and obviously surpassed the halfway mark. But, there remains the question of whether a municipality is answerable in money damages for the expenses incurred in reliance on the original permit which is later revoked because of city mis judgment in the first place.
1. TERMS OF MUNICIPAL LIABILITY
In New York, we have long since passed the era of sovereign immunity protection of municipalities from liability occasioned by acts of their employees (see Court of Claims Act, § 8; General Municipal Law, § 50 et seq.). Here, a permit was issued by the Building Commissioner allowing a proposed rebuilding which subsequently turned out to be invalid. When the permit was revoked, moneys had already been expended in the interim *450 towards the stipulated proposal. The causal relation is direct; the damages exposure of the city is evident.
Contrary to the negative projection envisioned by the city, liability here allows for just recompense and encourages the city to supervise carefully the acts of its officers and employees with a view to avoiding lawsuits and adverse money judgments. Total immunity from liability would encourage municipal impunity towards its residents, as then, little or no responsibility for wrongful acts would attach.
Here, moreover, issuance of building permits is a form of warranty given by the city which certifies approval of the contemplated plans and usage. There is an implied understanding that the permit will hold up and that the municipal officer had authority to use it. The implication of this agreement is borne in equity and fairness to the citizen who requests and obtains the permit with full disclosure of his planned expenditures in following up to build. ' It lies less in the wrongful aspect of municipal action. It comes out of a sense of justice incidental to the main action in equity seeking permit reinstatement.
2. section 50-e oe the municipal law is neitheb swobd nob
SHIELD TO THE CITY
The city counters that 154 has failed to serve a notice of claim as required by section 50-e of the General Municipal Law. However, section 50-e requires a notice only where a tort claim is asserted.
Since the action for damages is found to be in quasi contract and warranty, and incidental to the equitable declaratory judgment action, no notice of claim is required (Fontana v. Town of Hempstead, 18 A D 2d 1084, affd. 13 N Y 2d 1134; Accredited Demolition Constr. Corp. v. City of Yonkers, 37 A D 2d 708).
Section 50-e is a harsh provision not competing for the most just award of our times. But, considering its purposes, the statute does not really apply here anyway. The statute is designed to forewarn a municipality of accidents and potential liability from remote municipal property, so that witness statements and investigation can be pursued. It is basically an injury to person or property which is typically concerned. Here, the occurrences were administrative transactions done at the very heart of city authority, continuously within the knowledge of its officials and recorded in files at the Building Department right in the City Hall. The occurrence is recent. There is no concern about the city’s lack of awareness. The statute does not apply, either .in letter or principle (see Zillman v. Meadowbrook Hosp., 73 Misc 2d 726).
*451 3. DAMAGES
154 claims its damages to be $14,155.73. However, the court eliminates the costs of debris removal, cleanup, ánd safeguarding, since those would have been expended anyway by the destruction. The court will not hold the city to reimburse lost profits during the delay in construction since they are speculative. It will not allow the corporate expenses claimed by 154.
Accordingly, judgment is granted declaring that the respondent’s revocation of the building permit on September 21, 1972 was not arbitrary or improper, but was valid, and that respondent city is liable to plaintiffs for $5,785.32 in consequential damages, representing the. $4,864.75 obligation to the contractor Steins, $200 to the engineer Ostfeld, $550 to the draftsman Dell Nunzio, and $170.57 in Long Beach permit fees.